IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 12, 2003 Session

## STATE OF TENNESSEE v. MARCUS TRAMANE GREEN

**Appeal from the Circuit Court for Montgomery County**
**No. 40100307      John H. Gasaway, III, Judge**

_____

**No. M2002-01810-CCA-R3-CD - Filed April 28, 2003**

_____

The defendant, Marcus Tramane Green, appeals the sentence imposed by the Montgomery County Circuit Court following his guilty pleas to especially aggravated robbery, a Class A felony, and aggravated burglary, a Class C felony. The trial court sentenced him to respective concurrent terms of seventeen years as a Range I, violent offender and four and one-half years as a Range I, standard offender to be served in the Department of Correction. The defendant contends that his sentences are excessive, arguing that the trial court misapplied enhancement factors and failed to apply certain mitigating factors. We affirm the effective seventeen-year sentence imposed by the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JOE G. RILEY and THOMAS T. WOODALL, JJ., joined.

R. Todd Hansrote, Clarksville, Tennessee, for the appellant, Marcus Tramane Green.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and C. Daniel Brollier, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises out of the April 12, 2001 beating of Charlie Rye and taking of money and a television from his home. Around 7:50 a.m. on May 8, 2001, the defendant gave a statement to law enforcement relating that on the day in question, codefendants Robert Downey and Barbi Brown told him they knew a man with a lot of money. Downey and Brown returned a couple of hours later and asked if he was ready to go. Brown drove the trio to the victim's trailer. Downey looked through the window in the trailer's door and did not see anyone. Downey forced the door open and went to the back of the trailer. The defendant remained in the trailer's doorway. The defendant heard a noise, walked to the back, and saw Downey hit the victim several times. Downey told the defendant to check the victim's pants for money, but the defendant did not do so. Downey took

money from the pants, a television, and a container of coins. The defendant left the trailer followed by Downey, who put the television, money, and coins in the car. The three drove away, split the money, and took the defendant home. The defendant reported that he received $1000 and the codefendants each got $1200. He said he declined the container of coins.

The defendant pled guilty to especially aggravated robbery and aggravated burglary in exchange for the state dismissing three additional counts of conspiracy to commit robbery, theft of property valued over $1000, and attempted first degree murder. The parties also agreed that the sentences would run concurrently and would not exceed twenty years. Otherwise, the trial court was to determine the length of the sentences.

The defendant's sentencing hearing immediately followed that of codefendant Brown, who had also pled guilty to especially aggravated robbery and aggravated burglary. The parties agreed that the trial court should consider the testimony of Brown, the victim's son, and the victim from Brown's sentencing hearing as well as the defendant's and codefendant Downey's written statements to the Montgomery County Sheriff's Department.

Nineteen-year-old Barbi Michelle Brown testified that at the time of the offenses she, Downey, and the defendant were all jobless and needed money. She said she "hung out" with Downey and the defendant frequently and described twenty-three-year-old Downey as having the dominant personality in their group. She said she mentioned to Downey that she knew where they could get money, and he said they should do it. She said she picked the victim because she knew he would likely have money and did not think about the fact that he only weighed one hundred pounds. She said that after she suggested the crime, Downey then brought the defendant in on the offenses and began planning how to get the money. She said that at one point, Downey said he was going to hit the victim but that she told him they did not need to make their presence known in the victim's home. She said that Downey assented and dropped the matter.

Brown testified that they went to the victim's house around 2:00 a.m. and that she believed the victim would be asleep. She said she did not intend for the victim to be harmed and did not know that the victim had been beaten until the next day. Brown said that she was under the influence of alcohol and marijuana that night and that she got a little over $1000 in proceeds from the robbery. On cross-examination, she said she did not remember saying that the victim would be an "easy lick." The prosecutor confronted her with her written statement, and she acknowledged saying that it was discussed beforehand that Downey would hit the victim, knock him out, and take the money.

James Neal Rye, the victim's son, testified that he found the victim on the morning after the offenses. He noticed the victim's trailer door was open and could see the victim's wallet laying out. He heard a moan and found the motionless victim lying in a fetal position. The victim was bruised and bloody with a swollen head, and Mr. Rye could barely recognize him. Blood was on the bed linens and the wall. When Mr. Rye attempted to touch the victim, the victim began moaning, fighting, and speaking incoherently. The victim received medical care for about three months, including four to five days in intensive care and a month in a rehabilitation center. The victim was

in a coma for four days following the attack, and at one point, the doctor told the victim's family that he would die if they could not repair his collapsed lungs. Mr. Rye testified that the victim still did not remember things and used the wrong words in expressing himself. He said the victim now lived with Mr. Rye's family because they feared he might be victimized again if he were to live alone. He said Brown was his wife's niece, she had been to the victim's house on several occasions, and she knew the victim carried a large amount of cash.

Charles Rye testified that before the offenses, he was independent and lived alone in his home. He said he was sixty-six years old, and, at the time of the crimes, he weighed 102 to 103 pounds. He said that he did not remember anything about the night of the offenses and that $3200 had been taken from him. He said that he remembered being in the recovery and rehabilitation sections of the hospital and that he came out of rehabilitation after one and one-half months. He said that he continued to get names confused and that his head often "spun."

Codefendant Robert Taylor Downey gave a statement to law enforcement at 11:23 p.m. on May 8, 2001. This statement essentially tracks the defendant's statement of how the offenses occurred, except Downey said that when he entered the victim's room, the victim awoke and said something to him. He said he hit the victim six times. He said he gave the victim's pants to the defendant who took money from them and also got a bucket of money. Downey said he got the victim's television and ran to the car.

The defendant's mother, Antoinette Watson, testified at the sentencing hearing. Ms. Watson testified that before the offenses, the defendant lived with his girlfriend in a trailer across the street from her. She said that at the time of the offenses, the defendant was nineteen years old and his girlfriend was pregnant with the defendant's son. She said the defendant was between jobs and that he and his girlfriend were late in paying their electric bill and three months behind on the rent. She said the defendant was not a violent person and was more of a follower than a leader. She said the defendant had received counseling in the past for being suicidal, schizophrenic, and depressed. She said she learned of the offenses from her other son who had seen the defendant's picture on television. She said that after this, the defendant asked her to take him to turn himself in to the police. She said the defendant later told her that he did not know that Downey was going to do anything to the victim and that if he had known it, he would not have gone with Downey and Brown.

On cross-examination, she testified that the defendant was in trouble with the law once as a juvenile and that she had filed runaway charges against him a couple of times. She said he had been in and out of state custody mainly because of his mental problems. She agreed that the defendant was capable of working and had worked for TVA at one point but had quit.

The defendant testified that his codefendants Brown and Downey stopped by on the evening of the offenses. He said that he was not involved in planning the robbery and that Robert Downey told him they would merely sneak into the victim's house, take the money, and leave. He denied going with his codefendants when they drove by the victim's house earlier that day and said he did not hear any discussion concerning violence toward the victim or about Downey hitting the victim.

-3-

He said they went late at night in order that the victim would be asleep or gone. He said that he had never seen the victim before and that Brown never described the victim's age or size to him. He said Brown devised the plan for the offenses.

The defendant testified that Downey and Brown picked him up around midnight and that Downey had a heavy Mag flashlight. He said both he and Downey were suppose to go into the victim's house but he was afraid and remained at the victim's door, watching, until he heard a noise. He said he went inside and saw Downey hit the victim three or four times. He said Downey threw the victim's pants to him, and he dropped them and ran outside. He agreed that Downey gave him a container of coins and that he ran out the door. He said that participating in the offenses was a bad decision and that he turned himself in to the police and told them what happened, who was involved, and where they might find the victim's television.

The defendant testified that he joined in the offenses because he needed money to pay his electric bill and his rent. He said his electricity was due to be disconnected the day after the offenses, and he was going to be evicted. He said that his pregnant girlfriend had been near the time of delivery and that his son was born while he was incarcerated. He said that while in jail, a doctor treated him for depression, which had been ongoing since he was nine or ten years old. He agreed that he was hospitalized for attempting suicide at age ten and said that he had attempted suicide countless times. On cross-examination, he agreed that he told his girlfriend that he was going to go with the codefendants to commit the offenses to get money for their rent. He admitted that he got $1000 from the proceeds of the robbery and said he used it to pay his rent and his electric bill. He said he was not working at the time of the offenses because he "was just too lazy to get up and get a job."

The presentence report reveals that the then twenty-year-old defendant attended school through the tenth grade. He reported taking and failing the GED. The report reflects that the defendant has no prior criminal record and no record of arrests. He reported having no juvenile record as well. The defendant characterized his mental health as fair, stating that he takes medication for depression and had received counseling for four years. He reported using alcohol occasionally and experimenting with marijuana and "acid," but he denied regular or continued use of illegal drugs. The report reflects that the defendant has never been married and has two sons who live with their mothers. He said that he was not under court order to provide child support for these children but that he gave their mothers money whenever he could. The defendant, who had been incarcerated since May 8, 2001, reported working for Kentucky Fried Chicken in the two months preceding his arrest. He said he had worked for TVA as a laborer earning $10.89 an hour for two months in 1999. He also stated that he worked for a temporary service for one month. He reported that his mother took care of his living expenses during the times that he was unemployed.

As a Range I offender, the defendant's sentencing range was fifteen to twenty-five years for the especially aggravated robbery conviction, a Class A felony, and three to six years for the aggravated burglary conviction, a Class C felony. See Tenn. Code Ann. § 40-35-112(a)(1), (3). The trial court enhanced the defendant's sentences with the following enhancement factors:

(4) A victim of the offense was particularly vulnerable because of age or physical or mental disability, . . . ;

(5) The defendant treated or allowed the victim to be treated with exceptional cruelty during the commission of the offense; [and]

(6) The personal injuries inflicted or the amount of damage to property sustained by or taken from the victim was particularly great[.]

Tenn. Code Ann. § 40-35-114 (Supp. 2001) (amended 2002).[1] It applied mitigating factor (10), that the "defendant assisted the authorities in locating or recovering any property or person involved in the crime," because the defendant turned himself in to law enforcement and gave a statement. See Tenn. Code Ann. § 40-35-113(10). It also applied the "catch-all" mitigating factor (13), finding that the defendant had expressed genuine remorse for the crimes. See Tenn. Code Ann. § 40-35-113(13). It sentenced him to seventeen years for the especially aggravated robbery conviction and four and one-half years for the aggravated burglary conviction and ordered the sentences to run concurrently pursuant to the plea agreement.

The defendant challenges the enhancement factors that the trial court applied and contends that it should have also applied mitigating factors (4), (6), (7), (11), and (12). Accordingly, he argues that he is an especially mitigated offender because he has no prior felony convictions and only mitigating factors and no enhancing factors apply. See Tenn. Code Ann. § 40-35-109. The state concedes that the trial court erroneously applied enhancement factor (6), regarding particularly great injuries, to the defendant's especially aggravated robbery conviction but contends that the sentences are otherwise proper and that the effective seventeen-year sentence should be affirmed.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

In conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct,

---

[1]The legislature's 2002 amendment, not applicable here, added as the new enhancement factor (1) that the "offense was an act of terrorism" but changed the existing enhancement factors only in increasing their designating number by one.

(5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991); State v. Moss, 727 S.W.2d 229 (Tenn. 1986). We note that although the defendant entered guilty pleas to the offenses, he did not include in the record on appeal a transcript of the guilty plea hearing at which the convicting evidence would be presented by stipulation or testimony. A guilty plea hearing often provides an important occasion for the state to present its proof, and thus, it is the equivalent of a trial and should be made part of the record on appeal in order to comply with Tenn. Code Ann. § 40-35-210. The defendant has the responsibility of preparing a record that conveys a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. T.R.A.P. 24(b). Absent the guilty plea hearing, in which facts are presented, we may presume that the trial court was justified in applying the enhancement and mitigating factors. See, e.g., State v. Keen, 996 S.W.2d 842, 844 (Tenn. Crim. App. 1999). Nevertheless, in the present case, we believe the evidence presented at the sentencing hearing provides sufficient facts about the circumstances surrounding the offenses for us to examine the propriety of the defendant's sentence on the present record.

The defendant contends that the trial court should not have enhanced his sentences with enhancement factor (4), that the victim was particularly vulnerable due to age or physical condition. He argues that the record is devoid of proof that the victim's age or physical condition was a factor in planning the crimes. Instead, he asserts that the crimes revolved around stealth rather than force as he and Downey intended to sneak into the victim's home while he was asleep. He points out that he had never seen the victim before the offenses and that the record contains no proof that Brown told him the victim's age or size before the crimes. The state contends that the record supports the trial court's finding that the victim was particularly vulnerable and shows that the victim's vulnerability played a part in the crimes. Additionally, it argues that whether the defendant was aware of the victim's physical condition at the time of the offenses is irrelevant.

In applying enhancement factor (4), the trial court found that the victim was "particularly vulnerable" and concluded that enhancement factor (4) focuses upon the victim's condition and that the defendant's advance knowledge of that condition is irrelevant. Our supreme court has held that factor (4) "relates more to the natural physical and mental limitations of the victim than merely to the victim's age." State v. Adams, 864 S.W.2d 31, 35 (Tenn. 1993). Particular vulnerability is shown when, because of age or physical or mental condition, the victim is "incapable of resisting, summoning help, or testifying against the perpetrator." Id.

The defendant relies upon State v. Butler, 900 S.W.2d 305 (Tenn. Crim. App. 1994), to argue that the victim's age or physical condition had to be a factor in the planning or the commission of the crime for enhancement factor (4) to apply. In Butler, the defendant shot an elderly woman. This court held that "during the commission of the crime," the defendant must have taken advantage of the victim's inability to resist, summon help, or testify against the defendant in order for factor (4) to apply. Id. at 313. Because the victim was unexpectedly shot from a distance, we concluded that her age and physical condition were not factors in the commission of the offense. Id.

-6-

In the present case, the defendant and codefendants did take advantage of the victim's physical condition in perpetrating the offenses. The sixty-six-year-old victim weighed just over one hundred pounds and lived alone. Brown knew the victim and said in her statement that Downey was to hit the victim and knock him out. The defendant saw the victim as Downey was beating him. Despite the defendant's insistence that the crimes centered around stealth, the evidence reveals that the victim's frail stature prevented him from resisting Downey's beating and rendered him particularly vulnerable.

Also, our supreme court has stated that factor (4) hinges upon the victim's vulnerability relative to the crime committed. State v. Lewis, 44 S.W.3d 501, 505 (Tenn. 2001). It does not require the state to show that the defendant evaluated vulnerabilities and acted to capitalize on them. Id. We conclude that the trial court properly applied enhancement factor (4) to both sentences.

The defendant contends that the trial court erroneously applied factor (5), that the defendant allowed the victim to be treated with exceptional cruelty. He argues that the proof does not reveal a level of cruelty over that required to show serious bodily injury, which is an element of especially aggravated robbery. In applying factor (5), the trial court found that the defendant did not make any effort to stop Downey as he was beating the victim. The state contends that the evidence supports the trial court's application of this factor. It argues that the elderly victim was struck on the head numerous times with a Mag flashlight, left unconscious and bleeding by the defendant and codefendants, and spent four days in intensive care in a coma.

The application of factor (5) requires "exceptional cruelty," which is usually found in cases of abuse or torture. See State v. Williams, 920 S.W.2d 247, 250 (Tenn. Crim. App. 1995). Our supreme court has held that the facts must support a finding of "'exceptional cruelty' that 'demonstrates a culpability distinct from and appreciably greater than that incident to'" the crime. State v. Poole, 945 S.W.2d 93, 98 (Tenn. 1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994)). In other words, proper application of this factor requires a finding of cruelty "over and above" what is required for the offense itself. State v. Arnett, 49 S.W.3d 250, 258 (Tenn. 2001).

Especially aggravated robbery requires the intentional or knowing theft of another's property from his or her person by violence or putting the person in fear, the use of a deadly weapon, and that the victim suffer serious bodily injury. Tenn. Code Ann. § 39-13-403(a); see also Tenn. Code Ann. § 39-13-401(a). "Serious bodily injury" is defined as "bodily injury which involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; or (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Tenn. Code Ann. § 39-11-106(a)(34). In the present case, the evidence presented at the sentencing hearing shows that Downey struck the elderly victim in the head with a Mag flashlight six times, and the defendant said he saw Downey hit the victim three or four times. Following the beating, the defendant and Downey fled the trailer. As a result of the beating, the victim was bruised and bloody. When his son found him the next morning, he was unrecognizable and incoherent, and he remained in a coma for four days. In Poole, our supreme court concluded that knocking the elderly victim unconscious and leaving her on the floor bleeding

under circumstances making it unlikely that she would soon be discovered or receive treatment demonstrated a greater culpability than that needed for the commission of especially aggravated robbery. 945 S.W.2d at 99. The court noted that the defendants knew the victim lived alone. Id. We believe Poole dictates a similar result in this case. Thus, the evidence does not preponderate against the trial court's finding that the defendant allowed the victim to be treated with exceptional cruelty. Serious bodily injury is not an element of aggravated burglary, and therefore, we hold that factor (5) was also properly applied to this conviction based upon the defendant allowing Downey to beat the victim. See Tenn. Code Ann. § 39-14-403.

The defendant contends and the state concedes that the trial court improperly applied enhancement factor (6), that the victim received particularly great personal injuries, to his especially aggravated robbery conviction. Serious bodily injury is an essential element of especially aggravated robbery. Tenn. Code Ann. § 39-13-403(a)(2). Section 40-35-114 specifically prohibits using enhancement factors that are elements of the offense, and our supreme court has held that "proof of serious bodily injury will always constitute proof of particularly great injury." Jones, 883 S.W.2d at 602; State v. Nix, 922 S.W.2d 894, 903 (Tenn. Crim. App. 1995) (holding that factor (6) cannot be used to enhance a sentence for especially aggravated robbery). The defendant does not challenge the trial court's application of this factor to his aggravated burglary conviction, and we discern no basis to do so.

The defendant contends that the trial court should have applied the following mitigating factors to his sentences:

> (4) The defendant played a minor role in the commission of the offense;
>
> . . . ;
>
> (6) The defendant, because of youth . . ., lacked substantial judgment in committing the offense;
>
> (7) The defendant was motivated by a desire to provide necessities for the defendant's family or the defendant's self;
>
> . . . ;
>
> (11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;
>
> (12) The defendant acted under duress or under the domination of another person, even though the duress or the domination of another person is not sufficient to constitute a defense to the crime[.]

-8-

Tenn. Code Ann. § 40-35-113. Before the sentencing hearing, the defendant filed a notice of twenty-two mitigating factors, including those he advocates on appeal. In his argument at the sentencing hearing, the defendant referred the trial court to his notice of mitigating factors and merely stated that the testimony supported a substantial number of them. The trial court only addressed mitigating factors (10) and (13), relating to the defendant's remorse, and made no findings regarding the remaining factors.

With regard to mitigating factor (4), the defendant argues that his role in the offenses was a minor one because he did not know the victim beforehand and was not involved in planning the crimes. He argues that he did not injure the victim and did not enter the house until he heard Downey striking the victim. We believe the evidence does not support a conclusion that the defendant's role was minor. He testified that he was suppose to enter the victim's trailer with Downey but, instead, remained in the doorway and watched because he was afraid. He subsequently entered the trailer and admitted removing the victim's container of coins from the trailer. This evidence shows that the defendant acted as a lookout and helped remove the victim's property and does not reflect that his role was minor.

With respect to mitigating factor (6), the defendant argues that he lacked substantial judgment in committing the offenses because he was nineteen years old, had only a tenth-grade education, and was a follower rather than a leader. When determining the applicability of mitigating factor (6), the court should consider "the defendant's age, education, maturity, experience, mental capacity or development, and any other pertinent circumstance tending to demonstrate the defendant's ability or inability to appreciate the nature of his conduct." Adams, 864 S.W.2d at 33. As the state points out, the defendant was no longer a minor and was living on his own with his girlfriend. Although he has no prior criminal record, the defendant's mother testified that he had been in trouble as a juvenile. This evidence does not reveal that the defendant lacked substantial judgment because of his youth and limited education. Additionally, we note that the defendant testified that Brown and Downey contacted him about participating in the offenses, left for a time, then returned and picked him up around midnight before the offenses. Presumably, it was during the interval before his codefendants' return that he told his girlfriend that he was going to participate in the offenses in order to get money to pay their rent. These circumstances reflect that the defendant made a calculated judgment about participating in the offenses and belie the application of mitigating factor (6).

The defendant contends that the trial court should have applied mitigating factor (7), that he committed the crimes in order to obtain necessities, because he committed the offenses in order to get money for his overdue rent and electric bill. He points out that at the time, his pregnant girlfriend was close to delivery and that he used the proceeds of the robbery to maintain their shelter and electricity. The state argues that the defendant admitted that he was unemployed at the time of the offenses because he was too lazy to look for a job. We also note that the presentence report reveals that the defendant had a sparse employment history and largely relied upon his mother to support him. We do not believe mitigating factor (7) applies in these circumstances.

Finally, the defendant argues that his sentences should have been mitigated because he had no sustained intent to violate the law and was acting under the domination of his codefendants. See Tenn. Code Ann. § 40-35-113(11)-(12). He argues that the record does not reveal that he had chosen a criminal lifestyle. Rather, he asserts that his personal circumstances and the solicitation of his codefendants lured him into the commission of the offenses. The state argues that the record reflects that the defendant had a sustained intent to rob the victim in order to get money for his bills. It maintains that he agreed to break into the victim's house to steal his money and then followed through with those plans. Additionally, it contends that although the defendant's mother testified that he was a follower rather than a leader, the record contains no proof that the defendant was threatened or coerced into committing the crimes. We agree with the state. The evidence shows that the codefendants contacted the defendant about participating in the offenses earlier in the evening and then returned to get him around midnight. He said that he committed the offenses to get money for his bills and admitted that he helped carry items out of the house and received $1000 of the proceeds of the offenses. We believe the defendant's conduct reflects a sustained intent to violate the law. Finally, the record reflects that the defendant was motivated to participate in the offenses by his desire to get money and not because he was pressured by his codefendants. This factor also does not apply to the defendant's sentences.

We conclude that the trial court properly applied enhancement factors (4) and (5) but erroneously enhanced the defendant's especially aggravated robbery sentence with enhancement factor (6). None of the additional mitigating factors advanced by the defendant on appeal apply. In light of the severity of the victim's injuries, we believe that the seventeen-year sentence imposed for the especially aggravated robbery conviction is justified despite the erroneous application of enhancement factor (6). Based on the foregoing and the record as a whole, we affirm the sentences imposed by the trial court.

_____
JOSEPH M. TIPTON, JUDGE